REGAN, Judge.
Plaintiffs, the five children of Edward Boudreaux,[1] filed this suit against the defendant, The American Insurance Company as general liability insurer of Charles Petrossi, endeavoring to recover the sum of $125,000.00 for the death of their father as the result of a restaurant fire. They alleged Charles Petrossi, the owner, negligently maintained fire hazards which caused the fire.
Defendant answered denying negligence. In the alternative, it averred decedent’s intoxicated state prevented his responding to warning to vacate the premises, thus he was contributorily negligent.
From a judgment in favor of the defendant dismissing this suit, plaintiffs have appealed.
The record reveals that Charlie’s Steak House was destroyed by fire in the predawn hours of February 24, 1967. Almost one hour after the blaze was in progress, the dead body of plaintiffs’ father was discovered in his attic apartment in a building connected to the restaurant by a party wall. His death was caused by suffocation due to smoke inhalation.
The cause of the fire was not proven; however, two New Orleans Fire Department officials, whose opinions conflicted in several respects, agreed it originated in the kitchen of the restaurant. Anthony Engolia, a fire inspector who conducted the official investigation, testified the damage was so extensive it was not possible to determine what caused the conflagration. He arrived on the scene at 2:15 A.M., approximately fifteen minutes after the first alarm was sounded, to find the building engulfed in smoke and flames.
Engolia testified he conducted his investigation hours later after the fire had been extinguished. One significant conclusion he reached was that the fire extinguishing system installed in the kitchen did function, since traces of baking soda were found in the charred debris. He explained this equipment was activated when heat from the flames reached 185° temperature, thus releasing quantities of baking soda designed to drop and smother the flames. In order for the system to operate automatically, the heat from the fire must first melt fuse links that ordinarily keep the powdery substance from being discharged. His investigation disclosed these links were in fact melted.
The second official to testify was David Fontaine, director of the Fire Prevention Division of the New Orleans Fire Department. He, too, visited the fire while it was in progress and visited the scene once it had been extinguished. Although he stated twice it was impossible to determine the cause of the fire, he speculated it started when a flame from the kitchen somehow passed through one of the overhead grease filters into the. duct work and ignited grease accumulated on the sides thereof. This duct work runs through the *796 interior of the building- to the second floor ceiling before it reaches to the outside of the building. The hypothesis he advances as to cause is predicated on a finding of darkened areas on the exterior of the building near the duct work, indicating what he describes as a greater intensity of heat at these points. Fontaine did not conduct an investigation for the fire department. Not only does he differ with the official report as to the possibility of determining cause, but he also disputes the finding that the extinguishing system was activated automatically when the fire was in progress.
In addition to the testimony of the expert fire officials, evidence was adduced describing the restaurant kitchen equipment, and its use and maintenance. The appliances included a stove and two broilers placed next to the rear wall of the kitchen and a deep fryer positioned against the side wall opposite the party wall. All have pilot lights, according to the restaurant employees, that are lit each morning when the kitchen is open and extinguished by being “fanned out” at night when the kitchen closes. Workers also described pouring six to eight gallons of grease into the deep fryer each morning and draining it out each night. While not in use, the grease was stored in a metal container that was kept either in the yard or the kitchen. The testimony is in conflict on this point.
On the night of the fire, the cooks then on duty testified that they performed their usual chores before leaving, namely, cleaning the appliances, draining and storing the deep fryer grease and turning off all the pilot lights. These duties were completed by midnight, at which time the kitchen closed and the cooks went home. Charlie’s bar remained open, as it usually does, for another hour. Before locking up the restaurant that night, the bartender testified he checked the kitchen and was positive none of the stoves or broilers were lit.
As to maintenance, the record discloses that extensive renovations were completed in the kitchen within six weeks before the fire. Charles Petrossi testified the duct work, the hood over the stove and broilers, the grease filters, the duct work for the exhaust system, the vent stack and the fire extinguishing system were all new. The filters were cleaned weekly and Petrossi was endeavoring to find someone to clean the interior of the duct work several days before the fire occurred. It should be noted here that Fontaine estimated the filters should be cleaned every thirty days and the duct work annually, in Charlie’s kitchen to meet accepted standards of safety. Petrossi’s employees corroborated his testimony as to the installation of new equipment and its subsequent maintenance. Further, invoices from the contractor substantiate work was performed as the owner stated.
Plaintiffs have advanced several theories as to the cause of the fire, i. e. gas may have escaped when the pilot lights were “fanned out”, or grease accumulated in the duct work was ignited, or the drained grease from the deep fryer could have caused it. But there is no probative evidence to remove any from the realm of speculation. While it is true Fontaine first pinpointed the cause to a flame igniting accumulated grease on the interior duct work, he later weakened the force of his assertion by admitting it was not possible to determine the cause. Because the officer charged with the investigation positively stated the extensive damage rendered it impossible to determine the cause, we cannot conclude Fontaine’s contradictory testimony establishes the cause by a preponderance of the evidence.
Plaintiffs further argue two alleged deficiencies in the building’s construction constitute actionable negligence, i. e., a staircase that is not enclosed and the absence of a four hour fire wall around the exterior of the building. They assert these conditions are violations of requirements prescribed in the New Orleans Building *797 Code.[2] Because this structure was built prior to the adoption of the Code in 1956, Petrossi was not bound to alter his restaurant to conform to either requirement.[3] In any event, the record fails to connect the outbreak of the fire or Boudreaux’s subsequent death with either omission. Thus, we find no merit in this contention.
Turning to a more difficult question, we must now consider whether the trial judge erred in failing to apply the doctrine of res ipsa loquitur in weighing the evidence. In essence, the rule is applicable if an inference of negligence is raised simply from the occurrence of the accident. If this is the case once plaintiff establishes the happening, the burden of proving freedom from negligence then shifts to the defendant.[4]
Usually when' the doctrine is applied, the offending instrumentality — whether it be an exploding boiler or carbonated beverage bottle — is known. However, plaintiffs have cited several cases in which the evidentiary rule was invoked without the source of injury being established, but the circumstances were such that logic required the conclusion that defendant’s negligence could have been the only cause for the injury. In Dotson v. Louisiana Central Lumber,[5] an employee, trapped in the office on the third floor of a lumber mill, burned to death. The fire broke out while the mill was in operation and the victim’s escape route was cut off by intensive smoke and heat. There were no outside fire escapes. Although the court expressed the view res ipsa loquitur applied, a careful reading of the opinion indicates defendant’s liability was dictated by statute. Failure to install outside fire escapes was an omission for which the law imposed absolute liability if any death or personal injury resulted from fire in the nonconforming premises.
Not only does the statutory liability feature distinguish Dotson from the case now before us, but also it must be noted the fire started within the plant when it was in full operation, thus placing the circumstances of its occurrence within the defendant’s knowledge. In this case the kitchen was closed for two hours before the fire alarm was sounded and we cannot reasonably infer proof of cause was more readily available to defendant than it was to the plaintiffs.
Plaintiffs also cited language from Larkin v. State Farm Mutual Automobile Insurance Company, supra, to support their alternative argument. In that case, suit was brought to recover for the death of a guest passenger found in the wreckage of an automobile overturned in a canal. The physical evidence indicated the car had been traveling toward New Orleans on Airline Highway when it left the road, and traveled for a considerable distance on the right shoulder before veering left, cutting completely across the highway and overturning in a canal beyond the opposite shoulder of the road. In its original opinion, the Supreme Court supplied the inference that the negligence of the driver was the only reasonable explanation for the occurrence of the accident, thus the defendant was charged with the responsi *798 bility of affirmatively showing absence of negligence. On rehearing, however, the court reversed its position and held res ipsa loquitur was inapplicable because the circumstances did not preclude other reasonable hypotheses as to the cause.
We are of the opinion that the conclusion reached therein is applicable in this case. While we concede the possibility fire could have started from one of a number of sources in the kitchen, it is illogical to infer there was no other reasonable cause to which it could be ascribed.
In the other cases[6] cited by plaintiff where the courts have invoked the rule, the offending instrumentality was established by a preponderance of the evidence; therefore, they are inapposite.
Finally, we must consider whether defendant is liable under LSA-C.C. Article 667 because the fire originated in his premises. That article provides:
“Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.”
Since the evidence fails to establish the fire resulted from work carried on in the restaurant, the liability hereinabove outlined does not attach.
Thus we conclude the trial court properly dismissed this suit on a finding plaintiffs failed to establish defendant’s negligence by a preponderance of the evidence.
For the reasons assigned, the judgment appealed from is affirmed. Plaintiffs are to pay all costs incurred herein.
Affirmed.

. Three major children, Rosemary Bou-dreaux, wife of J. A. Wells, Rose Lee Boudreaux, wife of Elmo McFarlain and Robert Boudreaux, appeared individually. Mrs. Gladys Chalaire, widow of Edward Boudreaux, appeared as tutrix for her minor son, Richard, and curatrix for her interdicted major son, Raymond.

. New Orleans Building Code Art. 1103 provides in part:
“All exterior walls * * * which are less than 4' from adjacent property lines * * * shall be of not less than four hour fire resistive construction.” New Orleans Building Code Article 3308 provides in part: “Stairways are to be enclosed * *

. The code was adopted in 1956. Section 502 provides:
“Buildings in existence at the time of the passage of this Code may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the passage of this Code, provided such continued use is not dangerous to life.”

. Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704 (1948) ; Larkin v. State Farm Mutual Automobile Company, 233 La. 544, 97 So.2d 389 (1957) ; Jones v. Shell Petroleum Corporation, 185 La. 1067, 171 So. 447 (1936).

. 144 La. 78, 80 So. 205 (1918).

. In Plunkett v. United Electric Service, supra, a defective heater ignited a fire. In Jones v. Shell Petroleum, supra, an underground storage tank in a gas station caught fire while it was being filled from a tank truck. In Gerald v. Standard Oil Company of Louisiana, 204 La. 690, 16 So.2d 233 (1943) fumes from a tank truck delivering gas collected in a room nearby and exploded.